Filed 6/27/16  Lee v. DFS Group CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KAREN LEE,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>DFS GROUP, L.P., et al.,<br><br>　　　Defendants and Respondents. | A141489<br><br>(S.F. City & County<br>Super. Ct. No. CGC12519582) |

Plaintiff Karen Lee appeals a judgment entered after the trial court granted the motion of her former employer, DFS Group, L.P. (DFS), and her former manager, Vicki Giles, for summary judgment.  She contends she raised triable issues of material fact as to whether her termination from employment was the result of discrimination based on her age or national origin, whether the termination occurred in retaliation for her filing a complaint with the Equal Employment Opportunity Commission (EEOC), and whether she was subjected to a hostile work environment.  We shall affirm the judgment.

## I.  BACKGROUND

DFS is a Hong Kong-based retailer that operates duty free stores in the United States and other countries.  Plaintiff, who is of Chinese descent and was born in Asia, began working in the San Francisco office of DFS in 1998 as a data processor.[1]  She became a merchandise assistant in 2006 and worked in that role in the men's leather department until 2008, when she transferred to the Polo department.  Her responsibilities

---

[1] She had previously worked for DFS's Hong Kong office from 1971 until 1982 as a senior control clerk, before leaving the company to care for her children.

included following up on correspondence requests and projects as directed by the merchandise manager, communicating with divisions and vendors, updating "assortment plan files," generating reports, maintaining files and records, assisting managers and the vice president with meeting preparations, and interpreting emails and correcting errors. She also had responsibility to create "SKU's," or stock-keeping unit numbers, for the products sold in DFS's stores, and to maintain an accurate database of SKU's. SKU's specifically identified each product in the stores' inventory. The SKU system allowed the company to track, count, order, and replenish products from its suppliers. The job required being "detail oriented with a high level of accuracy and the ability to detect inconsistencies in data."

In 2010, the Polo team moved to Hong Kong and, along with much of the Polo team, plaintiff received a layoff notice. Plaintiff learned there was an opening on the beauty team, and she applied for it. She interviewed with defendant Vicki Giles, the merchandise manager of the European Cosmetics team. Giles offered her the position of merchandise assistant in July 2010, and she began working for the team in August 2010. Plaintiff was 57 years old at the time. Giles knew plaintiff was Asian, spoke English with an accent, and appeared to be over 40 years of age. The other people on the team were Alice Dare, Bridget Millard, and Hsiao-Wei Cheng. Millard and Cheng were Assistant Merchandise Managers, a level above plaintiff and Dare, the two Merchandise Assistants. Plaintiff testified that Dare was Indonesian, spoke with an accent, and appeared to be in her 40's,[2] Millard was white and appeared to be in her 20's, and Cheng was Taiwanese and appeared to be in her 30's. Giles was over 60 years old.

Giles stated in a declaration in support of the motion for summary judgment that within a few months of plaintiff's arrival on the cosmetics team, she concluded plaintiff's job performance was deficient. In particular, Giles stated, plaintiff had difficulty completing simple tasks on her own, she failed to double-check her work, and plaintiff's co-workers had complained that they often found mistakes in her work and had to correct

---

[2] It is undisputed that Dare was over 40 years old.

them.  In October 2010, Giles had a meeting with plaintiff to discuss her concerns.  She told plaintiff that she should not rush through her work and that she should listen to those who were training her, because the work with beauty products was different from the work plaintiff had been accustomed to doing with fashion products.

Giles stated in her declaration that over the course of the following two months, plaintiff "continued to exhibit an unwillingness to solve problems on her own, was a challenge to teach because she lacked attention to detail, and was unwilling to help others on the team."  She gave plaintiff an overall merit rating of "2," or "Needs Improvement," on her January 2011 performance review; the review included "2's" for most of the individual categories, including quality of work, productivity and organization, job knowledge, flexibility, collaboration, and communications.  The performance review indicated that plaintiff seemed to expect others to solve problems for her, she tended to revert to the ways she had used in the fashion group, she used "shortcuts" that did not work as well in beauty as in fashion, she did not show willingness to help others on the team, she complained about her workload and about receiving assignments, she needed to be more thorough when reading through emails, she needed to write instructions down so as not to ask the same questions repeatedly, and she needed to slow down rather than rushing through tasks.

Lee met with Gena Rubia, a human resources manager, to discuss her concerns about the performance review.  Rubia sent an email to Giles on February 4, 2011, telling her that plaintiff had told her this was the first time she had been told of problems with her performance.  Rubia told Giles that "obviously" plaintiff had forgotten previous instances when Giles had discussed plaintiff's errors.  On February 7, 2011, plaintiff sent an email to Rubia pointing out that her previous evaluations had all been more positive and expressing her concern that she had not received any notice that Giles found her performance unsatisfactory until she received her annual evaluation.

Giles issued a Performance Improvement Plan (PIP) to plaintiff on March 8, 2011.  She pointed out a number of problems with plaintiff's work.  According to  Giles, on several occasions plaintiff had shown the "inability" to follow the guidelines for creating

3

an accurate SKU; she had shown an "inability to adjust to changing priorities" and did not follow clear requests in emails without reconfirming the action she was asked to take; and she did not "retain" the knowledge necessary perform her job accurately. The PIP indicated plaintiff was expected to improve the quality of her work by creating accurate SKU descriptions and placing new products and SKU's in the correct subclass; improve her flexibility by understanding email directions and being able to determine the action required from written instructions; and improve her "[j]ob knowledge specific to European Brands" by understanding "root style process when setting up skus for product with multiple colors" and updating "[a]ssortments" correctly when creating and discontinuing SKU's. The PIP memorandum informed plaintiff that if she did not improve her performance immediately, "[f]urther action may be taken, up to and including termination," and stated Giles would review plaintiff's performance on April 7.

Giles stated in her declaration that plaintiff continued to make major mistakes that others had to correct, such as errors in creating SKU's that prevented orders from being placed correctly. The record includes emails from Millard to plaintiff explaining that plaintiff had used the wrong method to create SKU's and telling her, "we need to let go of the way we 'used' to do things and be willing to learn the new and right way to process things on this team." Millard also told plaintiff she had made other errors and omissions in her work that she should have recognized and corrected. Giles met with plaintiff again on March 25, 2011 and told her she needed to pay more attention to detail, double-check her work, not rush through her work, and be more patient with tasks.

A few days later, on March 29, 2011, the European Cosmetics team became "locked out" of the computer system. Millard, the assistant merchandise manager, told plaintiff to call the service center, which could immediately reset the password. Plaintiff said she wanted to email the service center instead. Millard told her again to call the service center; plaintiff picked up the phone, said a few words, and hung up. She told Millard she had called and spoken with a service representative, who had told her to email the request to them. Millard called the service center herself and found there were no live representatives available; rather, the service center was only accepting voicemails.

4

The service center's message said nothing about sending email requests. Millard told Giles about the incident, and they confronted plaintiff about her conduct and told her it was inappropriate. That afternoon, plaintiff sent an email to Rubia, complaining that Giles and Millard had subjected her to "abusive" conduct.

Earlier the same day, March 29, Rubia had received a copy of a March 26, 2011 letter from plaintiff to the EEOC complaining of discrimination and harassment. Rubia stated in her declaration that she did not inform anyone at DFS about the EEOC complaint until after plaintiff sent an email to Rubia, Giles, and Millard on March 30 that referred to her EEOC complaint, and Giles confirmed in her declaration that she did not learn of the complaint until she received plaintiff's March 30 email.

Giles decided to terminate plaintiff's employment as of April 7, 2011. She stated in her declaration that she made the decision the week after the incident with the service center, and that her decision was "due in part to the incident that had just transpired with the service desk, but also because she continued to make mistakes in her work, she was not solving problems on her own, she lacked attention to detail, and was unwilling to help others on the team."

Giles also stated in her declaration that she had terminated only one other employee for poor performance during her career at DFS; the other employee was 29 years old at the time. She had never intentionally excluded plaintiff from meetings relevant to her job.

In opposition to the motion for summary judgment, plaintiff submitted evidence that in the years before she began working with the European Cosmetics team, she received consistently positive feedback and performance reviews. During the years from 1999 to 2009, her overall rating had never been lower than "3," or "Good/Satisfactory," on a number of occasions it had been "4," or "Very Good," twice (in 2000 and 2001) it had been "5," or "Outstanding," and during that time plaintiff had only once received below "3" in any individual category on her annual reviews (a "2" in communications for 2008). Her reviews included many positive comments about her work. She had been given an "Above and Beyond Award" in 2004 and a "Fashion Team Quarterback Award"

5

in 2008. Moreover, when Giles was seeking a new merchandising assistant, plaintiff's former manager had recommended her highly, saying, "of all the support staff we have, I would put Karen on the very top of the list. . . . [S]he is well versed in all the systems that we use today . . . . She single-handedly takes care of the SKU database with ease for the department that is number 1 in DFS, when it comes to SKU count. . . . [¶] She is reliable, accountable, and someone that you can count on to be where she is supposed to be all the time. . . . I can't say enough good things about her."

To support her claims that her dismissal was due to discrimination based on age, race, or national origin, plaintiff pointed to events that occurred during her time with the European Cosmetics team. One of these is a series of email exchanges that took place during January and February 2011. In an email exchange with the subject line, "TR EXCLUSIVE PRESENTATION," Giles asked plaintiff to set up SKU's for certain products. Plaintiff then exchanged a number of emails with several other people seeking clarification of how to proceed with the task. She finally forwarded the emails to Dare, the other merchandise assistant, asking, "I need your help and send the email for you to review instead of asking the point much more clearly. I don't know how to process." Dare forwarded the email to Giles, with a new subject line, "English Communication Problems!" and the text: "Please read the email from CHAN Kit below, she already told her very clear, but [plaintiff] still don't understand, do you understand? [¶] If English communication is very Poor, I can't help to walk her through. [¶] Please understand your brands is so complicated and needs a person who understand better English, thanks. [¶] Also please note that I will not be cleaning-up for the future, thanks." Giles forwarded the email exchange to Rubia, saying it was "clear evidence." Rubia responded that plaintiff wasn't "getting it." She suggested that Giles explain to plaintiff how to do the job correctly and that Dare should not be asked to help plaintiff "since her emotions are high." Rubia told Giles she had received a follow-up email from plaintiff, and that she "strongly believe[d] that [plaintiff was] being coached and so we need to tread carefully and thoroughly." Giles also forwarded the email chain to plaintiff, with Dare's

6

message deleted but the subject line "English Communication problems!" intact, and the text, "I see that you are confused about this. Can we discuss?"

Plaintiff also relies for her claims of discrimination and harassment on evidence of remarks made by members of the department, primarily Dare. Among those, Dare said to her "Use your brain," "Do you remember this?" and "Do you know how to think?" She also told plaintiff that if she was not happy, she should resign. In mid-March 2011, Dare said with an "intimidating look of anger," " 'You need to use your brain!' " After the incident in which Millard directed plaintiff to call the support desk, Giles and Millard took her into an office and yelled at her. Millard told her to bring her brain to work, and Giles nodded twice. On March 23, 2011, Giles, Dare, and Millard had a meeting regarding a special project; when plaintiff asked why she had been kept from the meeting, Dare and Millard told her she had an " 'old way of doing things.' "[3] As evidence of discrimination based on national origin, plaintiff points to evidence that, on one occasion, Dare referred to Cheng, who was of Taiwanese origin, as "someone who surfed the Internet and goes home early a lot." Plaintiff suggests this was a disparaging reference to Cheng's race.

Plaintiff also pointed to evidence that on various occasions during her time working on the European Cosmetics team, colleagues thanked her for her work or her help. She stated in a declaration that while working on the team, "I was able and willing to perform the job responsibilities of a Merchandise Assistant for the European Cosmetics Department. I was able and willing to accept direction on the way the

---

[3] This testimony is arguably inconsistent with plaintiff's deposition testimony that she did not know what the meeting was about and never asked because she was "so scared." " 'In determining whether any triable issue of material fact exists, the trial court may, in its discretion, give great weigh to admissions made in deposition and disregard contradictory and self-serving affidavits of the party.' [Citation.]" (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 860.) DFS objected to this portion of plaintiff's declaration, but there is no indication the trial court ruled on its objection. Whether or not we considered the statement made in plaintiff's declaration, we would reach the same conclusion.

7

European Cosmetics Department processed SKUs. I was very willing to help others on the European Cosmetics team, including Ms. Millard and Ms. Dare. [¶] . . . I received numerous requests for assistance from my fellow team members in the European Cosmetics Department, and I willingly assisted them. . . . [¶] . . . I caught several errors or mistakes in the data or processing."

After plaintiff was dismissed, she was replaced with an Asian woman whom she asserted was younger than plaintiff.

Plaintiff brought this action for discrimination based on race, age, and national origin in violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq; FEHA); retaliation in violation of FEHA; failure to prevent and investigate discrimination in violation of FEHA; hostile work environment in violation of FEHA; wrongful termination; violation of public policy; and intentional infliction of emotional distress. Defendants moved for summary judgment, and the trial court granted the motion and entered judgment accordingly.[4]

## II.  DISCUSSION

On appeal from a grant of summary judgment, we review the record de novo. (*Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813.) A motion is properly granted " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " (*Ibid*., citing Code Civ. Proc., § 437c, subd. (c).) We do not defer to the trial court and are not bound by its reasoning; we review the trial court's ruling, not its rationale. (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 967 (*Lattimore*).) In doing so, " 'First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue.' [Citation.] [¶] . . . 'We liberally construe the evidence in

---

[4] On appeal, plaintiff challenges the trial court's ruling only as it pertains to her claims for discrimination based on age and national origin, retaliation, and hostile work environment based on her age.

8

support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' [Citation.] However, triable issues of fact can only be created by conflicting evidence, not speculation or conjecture. [Citation.]" (*Ibid*.)

In considering a grant of summary judgment in a case alleging employment discrimination where the evidence offered to show discriminatory intent is circumstantial, we apply the *McDonnell Douglas* test. (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792; *Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 122–123; and see *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215 [in FEHA cases not involving mixed motives, court has adopted *McDonnell Douglas* test].) "At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job [she] sought was withdrawn or never filled. [Citations.] While the plaintiff's prima facie burden is 'not onerous' [citation], [she] must at least show ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .' [Citation.]" [Citation.]' [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–355 (*Guz*).) To establish a prima facie case, the plaintiff generally "must provide evidence that (1) [she] was a member of a protected class, (2) [she] was qualified for the position [she] sought or was performing competently in the position [she] held, (3) [she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. [Citations.]" (*Id.* at p. 355.)

If the plaintiff establishes a prima facie case at trial, the burden shifts to the employer to produce admissible evidence, sufficient to raise a genuine issue of fact and to justify judgment for the employer, that its action was taken for a "legitimate, nondiscriminatory reason." (*Guz, supra*, 24 Cal.4th at pp. 355–356.) The employer's reasons need not have been wise or correct, as long as they are nondiscriminatory.

"While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with a *motive to discriminate illegally.* Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias* and which, if true, would thus preclude a finding *of discrimination.* [Citations.]" (*Id.* at p. 358.) If the employer meets this burden, the plaintiff has the opportunity to attack the employer's proffered reasons as pretexts for discrimination or to produce other evidence of discriminatory motive. The plaintiff retains the burden of proving discrimination. (*Id.* at p. 356.)

Courts have noted that the *McDonnell Douglas* test was originally developed for use at trial, not in summary judgment proceedings. "The burdens and order of proof therefore shift under the *McDonnell Douglas* test when an employer defendant seeks summary judgment. [Citation.] An employer defendant may meet its initial burden on summary judgment, and require the employee plaintiff to present evidence establishing a triable issue of material fact, by presenting evidence that *either* negates an element of the employee's prima facie case, or establishes a legitimate nondiscriminatory reason for taking the adverse employment action against the employee. [Citations.] [¶] '[T]o avoid summary judgment [on the second of these two grounds], an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citations.]" (*Swanson v. Morongo Unified School Dis.* (2014) 232 Cal.App.4th 954, 965–966 (*Swanson*).) To meet this burden, it is not enough to show "the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the . . . [asserted] non-discriminatory reasons.' [Citations.]" [Citations.]' [Citation.]" (*Horn v. Cushman & Wakefield*

10

*Western, Inc.* (1999) 72 Cal.App.4th 798, 807 (*Horn*); accord *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 147 ["Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination . . ."]; *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).)

Ultimately, "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361.)

## A. Age Discrimination

FEHA makes it unlawful for an employer, "because of the race, . . . national origin, . . . [or] age of any person, . . . to discharge the person from employment." (Gov. Code, § 12940, subd. (a).)

A plaintiff may establish a prima facie case of age discrimination by showing (1) she belongs to a protected class of workers, 40 years of age or older; (2) she performed her job satisfactorily; (3) she was discharged; and (4) there is other evidence of discriminatory motive, e.g., others not in the protected class retained similar jobs, or the job was filled by someone with comparable qualifications not in the protected class. (*Guz*, *supra*, 24 Cal.4th at p. 355; *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 200; *Hersant*, *supra*, 57 Cal.App.4th at p. 1003.)

There is no dispute that plaintiff is over the age of 40 or that she was discharged. As to the other two elements of a prima facie case, plaintiff contends her previous reviews, in different departments under different managers, show that she was performing her job satisfactorily, and that the woman who replaced her was substantially younger than she was. There is no direct evidence in the record of her replacement's age; plaintiff relies only on a printout of a "LinkedIn" profile, which shows a woman of the same name as plaintiff's replacement, who appears to be well under the age of 40.

We doubt that plaintiff's prior job reviews show that she carried out her duties in a satisfactory manner in her *new* department or that plaintiff has adequate evidence of her

11

replacement's age. In any case, even assuming the record shows plaintiff can meet her initial burden, DFS in turn has met its burden on summary judgment to establish a legitimate nondiscriminatory reason for terminating her employment. (See *Swanson*, *supra*, 232 Cal.App.4th at pp. 965–966.) There is ample evidence that Giles all along believed plaintiff's job performance was deficient. Giles stated in her declaration that plaintiff had trouble completing simple tasks on her own, she did not double-check her work, and her colleagues had complained her work was inaccurate. Giles met with plaintiff in October 2010, only two months after she began working in the European Cosmetics department, and told her she should not rush through her work and she should listen to those who were training her.[5] Over the ensuing two months, plaintiff's difficulties with her job performance continued. After her performance review and issuance of her PIP, Giles stated, plaintiff continued to make major mistakes that others had to correct, did not solve problems on her own, lacked attention to detail, and was unwilling to help others. According to Giles and Millard, plaintiff resisted directions and then lied when told to call the service center. This evidence is ample to show a nondiscriminatory reason for terminating plaintiff's employment.

The burden thus shifted to plaintiff to produce substantial evidence that the stated reason for her termination was untrue or pretextual or that DFS acted with discriminatory animus, such that a trier of fact could conclude DFS engaged in intentional

___

[5] Plaintiff argues she did not receive notice of Giles's concerns until her negative performance review in January 2011. As evidence, she relies only on an email she sent to Rubia on February 7, 2011, expressing her concern that "the comments that appeared on the evaluation, if true, should have been brought up well before the end of the year" and stating she was unaware of the problems before she saw the evaluation, and a February 4, 2011 email from Rubia to Giles informing her that plaintiff had told Rubia she had not been warned of performance issues until the evaluation and that plaintiff had "obviously" forgotten that Giles had discussed plaintiff's errors with her. Plaintiff does not deny in her declaration that the October 2010 meeting in fact took place, and she points to no portion of her deposition in which she denied having met with Giles. Moreover, in her response to defendant's separate statement of undisputed facts, plaintiff acknowledged that it was undisputed that Giles met with plaintiff in October 2010; she disputed only the validity of Giles's concerns regarding her performance. It is therefore undisputed that the meeting took place; however, even if it did not, our conclusions would be the same.

12

discrimination. (*Swanson*, *supra*, 232 Cal.App.4th at p. 966.) She has not met this burden. There is nothing implausible, inconsistent, contradictory, or incoherent in DFS's proffered basis for Giles's decision to terminate plaintiff's employment, i.e., the work in the European Cosmetics team required a high level of accuracy and attention to detail, she failed to double-check her work, she had difficulty completing tasks on her own, and her co-workers complained that they often had to correct her errors. (See *Horn*, *supra*, 72 Cal.App.4th at p. 807.)

Plaintiff argues that the positive reviews and comments she had received based on her previous work in other departments shows that Giles "got it wrong" in downgrading her performance. The issue, however, is not whether Giles was correct in her evaluation of plaintiff's work, but whether she and DFS engaged in intentional discrimination. (*Horn*, *supra*, 72 Cal.App.4th at p. 807; *Swanson*, *supra*, 232 Cal.App.4th at pp. 965–966.)

Plaintiff draws our attention to federal cases in which a sudden downgrade in performance ratings was found to support an inference of pretext.[6] Each of these cases included additional factors beyond the downgrade that suggested pretext or discriminatory animus. *Danzer v. Norden Sys., Inc.* (2d Cir. 1998) 151 F.3d 50, 56, stated that a sudden decline in performance ratings cannot, by itself, provide a basis for a discrimination action. In light of *additional* evidence of age-related animus, including the plaintiff's supervisor's request that the plaintiff prepare a chart indicating staff ages to corroborate the supervisor's suspicion that the average age of engineers was well into the 40's and 50's, and statements by the plaintiff's supervisor that he wanted to get some younger people on board to raise the IQ of the staff and that the current staff were " 'altasic cockers' " (a Yiddish phrase translated as " 'old fogies' "), the court concluded additional indicia of discrimination were present and the plaintiff was entitled to have a

---

[6] In interpreting FEHA, California courts have looked to federal cases interpreting title VII of the Federal Civil Rights Act, 42 United States Code section 2000e et seq. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 278–279 (*Lyle*); *Mixon v. Fair Employment & Hous. Com.* (1987) 192 Cal.App.3d 1306, 1316–1317.)

13

jury decide whether the defendant had engaged in employment discrimination. (*Id*. at pp. 53, 56–57.) In *Sempier v. Johnson & Higgins* (3d Cir. 1995) 45 F.3d 724, 731–732, not only had the plaintiff's performance evaluations been satisfactory, but the defendant had instituted a coercive early retirement program shortly before it forced the plaintiff's resignation. In *Ross v. Campbell Soup Co.* (6th Cir. 2001) 237 F.3d 701, 704, 708, not only had the plaintiff received favorable performance reports in the past, but there was evidence he had received a dramatic increase in his sales quotas, he had been invited to retire, and the company had expressed concern about his disability in an internal memorandum. There was evidence in *Winarto v. Toshiba Am. Elecs. Components, Inc.* (9th Cir. 2001) 274 F.3d 1276, 1284–1286, that the defendant had given the plaintiff a poor evaluation in retaliation for her protected complaints to human resources. In *Bahri v. Home Depot USA, Inc.* (D. Or. 2002) 242 F.Supp.2d 922, 942, 944–945, multiple plaintiffs suffered a sudden decline in their job performance ratings and there was evidence of discriminatory comments and a disproportionate number of involuntary terminations of older employees and replacement by younger employees after a new manager took charge. The plaintiff in *Gunby v. Pennsylvania Electric Co.* (3d Cir. 1988) 840 F.2d 1108, 1112, 1114, 1117, who claimed race discrimination, was given a negative performance evaluation *after* he had expressed his displeasure that a white man whom he believed to be less qualified had been chosen for a position in the company for which he had applied, and at the same time the vice-president of Human Resources decided to offer another white man a position for which plaintiff did not have the opportunity to apply. Moreover, the plaintiff received a contemporaneous positive recommendation from his supervisor. In *Back v. Hastings on Hudson Union Free Sch. Dist*. (2d Cir. 2004) 365 F.3d 107, 114–115, the plaintiff was denied tenure in the year after having a baby; as her tenure year approached, her supervisors began to express concern that, as a mother, the plaintiff would not be able to do her job and would not remain committed to her work, and they told her they would recommend she be denied tenure. After the plaintiff had retained counsel, the supervisors filed their first negative evaluation of her. A few months later, the school district notified the plaintiff that her probationary appointment

would be terminated. (*Id*. at p. 116–117.) The appellate court concluded that the fact that the sudden decline in performance evaluations began only *after* the alleged discriminatory comments began supported a conclusion of pretext. (*Id*. at p. 125 & fn. 16; but see *Testerman v. EDS Technical Products Corp.* (7th Cir. 1996) 98 F.3d 297, 299–300, 305–306 [no pretext in post-discharge negative review where plaintiff had recently begun a new position with new responsibilities and did not contest most of factual allegations in review].)

These authorities do not defeat the motion for summary judgment. First, although plaintiff's 2010 review was more negative than any she had received in the past, the decline was not necessarily sudden. Plaintiff's reviews had shown a general downward trend over the previous decade: her "Overall Merit Rating" for 1999 was "3," for 2000 and 2001 it was "5," for 2002 through 2007 it was "4," and for 2008 and 2009 it was "3."

In any case, even assuming the decline in the 2010 performance rating was sudden, plaintiff has not shown the type of additional circumstances present in each of the cases upon which she relies. Plaintiff contends the remarks made by Dare and Millard, to the effect that she should use her brain and bring her brain to work and asking her if she knew how to think, are evidence that her discharge was motivated by age-related animus. None of these remarks mentions plaintiff's age, and in our view, no reasonable juror could conclude they referred indirectly to her age. Plaintiff stated in her declaration that after she was excluded from a meeting, Dare and Millard told her she had an " 'old way of doing things.' "[7] While this alleged statement contains the word "old," it is clear in the context of this case that it refers not to plaintiff's age but to her continuing to use methods she had used in other departments, rather than those used in European Cosmetics. Moreover, none of the comments of which plaintiff complains

[7] Plaintiff also contends that the fact she was not invited to a meeting with Giles, Dare, and Millard regarding a special project would support an inference that the decision to dismiss her had already been made and the PIP was merely "window dressing." We reject this contention. Nothing in the record suggests the meeting was related to plaintiff's job duties.

were made by Giles, plaintiff's supervisor. The only time Giles appears to have been present when one of the comments was made was when Giles and Millard confronted plaintiff after she resisted the instruction to call the support desk; plaintiff avers Giles nodded twice when Millard told her to bring her brain to work. Nothing in this conversation shows animus based on plaintiff's age, rather than anger at her recent actions, or suggests that defendants' proffered reasons were pretextual.

For the proposition that remarks by the lower-level employees Dare and Millard show discrimination on *Giles's* part, plaintiff cites *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 668–669, which permitted reliance on statements of lower-level employees that were made as part of a professor's tenure review process as evidence of race-based discrimination. In doing so, the court noted that the various stages of tenure review were not compartmentalized, and explicitly distinguished on that basis age discrimination cases concluding that statements by lower level managers did not support an inference of discrimination against the ultimate decision maker. (*Id.* at pp. 669–670.) And, in *Bergene v. Salt River Project Agric. Improvement & Power Dist.* (9th Cir. 2001) 272 F.3d 1136, 1141, the court stated, "Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company if the manager was involved in the hiring decision." Here, on the other hand, while the employees who made the remarks of which plaintiff complains may have expressed frustration with plaintiff to Giles, there is no evidence either that they were expressing animus based on her age or that they were involved in the decision to terminate her employment.

Plaintiff's reliance on *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113, is similarly unavailing. *Reeves* explained that under the "cat's paw" doctrine, "it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action. If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through

16

the tool to their common employer." (*Ibid.*) Nothing in this record supports an inference that Giles acted as the "tool" of her subordinates, and in any case, as we have just explained, nothing suggests the other employees were motivated by animus based on plaintiff's age.

Nor do we find persuasive plaintiff's argument that the use of "subjective" criteria in her annual review, such as references to not being a "team player" or needing an "attitude change," rendered the review susceptible to abuse and likely to mask pretext. (See *Colon-Sanchez v. Marsh* (10th Cir. 1984) 733 F.2d 78, 81 [use of subjective criteria in evaluating candidates who are not objectively equally qualified may be relevant to showing of pretext]; *Goosby v. Johnson & Johnson Med., Inc.* (3d Cir. 2000) 228 F.3d 313, 321 ["just as use of [highly subjective] criteria does not establish discrimination, cloaking such criteria with an appearance of objectivity does not immunize an employment decision from a claim of discrimination"]; *Mohammed v. Callaway* (10th Cir. 1983) 698 F.2d 395, 401 ["the use of subjective factors supports an inference of pretext when an employer justifies rejection of a minority candidate on the basis of such factors even though the minority is objectively better qualified than the non-minority chosen"]; *Tomasso v. Boeing Co.* (3d Cir. 2006) 445 F.3d 702, 706 (*Tomasso*) [low evaluation scores may be pretext for discrimination, particularly where employer uses subjective criteria such as "attitude" and "teamwork" to rate employees].) As *Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1005, teaches, however, although subjective evaluations may lend themselves to discriminatory abuse and should be closely scrutinized, the fact that an assessment was based upon subjective criteria is not inherently suspect and does not, by itself, demonstrate pretext. Here, the proffered reasons for terminating plaintiff's employment were not primarily the subjective factors of which she complains; rather, Giles testified, she made the decision because of the service desk incident, plaintiff's failure to solve problems on her own, and the mistakes in her work, as well as her unwillingness to help others on the team.

*Tomasso* explains that in order to show pretext, the plaintiff must point to some evidence from which a factfinder could either disbelieve the employer's reasons or

believe a discriminatory reason was a motivating determinative factor in the employer's action. The plaintiff "must do more than show that [the employer] was 'wrong or mistaken' in [taking the action.] [Citation.] He must 'present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.' [Citation.]" (*Tomasso*, *supra*, 445 F.3d at p. 706.) As evidence of the suspect nature of the criticism that she was not a team player, plaintiff relies upon her own testimony that she was willing and able to do her job and help others on the team, and on emails from co-workers, including Giles, thanking her for her help or telling her she had done a good job on a particular task. However, "plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*).)[8] Nor does the fact that employees thanked plaintiff on occasion or indicated

[8] Plaintiff argues that under *Tomasso* and *Weldon v. Kraft, Inc.* (3d Cir. 1990) 896 F.2d 793, her testimony was sufficient to create a triable issue of fact. Those cases are distinguishable. In *Tomasso*, the plaintiff's affidavit flatly contradicted his manager's testimony that the plaintiff had stated he was not interested in training people or having working relationships with his peers. (*Tomasso*, *supra*, 445 F.3d at pp. 705, 709.) In *Weldon*, the plaintiff offered testimony that certain black employees had been a target of his supervisor's racism and that a personnel manager had told him the supervisor had difficulty working with minority employees; the personnel manager denied having made the statement. (*Weldon*, 896 F.2d at pp. 794–796, 799–800.) She also points to *Chipollini v. Spencer Gifts, Inc.* (3d Cir. 1987) 814 F.2d 893, 910 (disapproved on other grounds as stated in *McKenna v. Pacific Rail Serv.* (3d Cir. 1994) 32 F.3d 820, 826); there, the plaintiff's affidavit contradicted the defendant's position that he had performed his duties as "energy warden" poorly by denying that he had ever been assigned such a role, and denied the defendant's assertion that it was concerned about his reduced ability to travel due to a health problem by stating that the problem was a minor one that had become a concern only after the case began. In each of these cases, the plaintiff's testimony contradicted specific facts put forth by the defendant. Plaintiff's subjective belief that she was a team player does not rise to this level and is insufficient to create a triable issue as to pretext. (*King*, *supra*, 152 Cal.App.4th at p. 433.) In effect, it is no more than an assertion that Giles was "wrong or mistaken" in her evaluation of plaintiff's work. (*Tomasso*, 445 F.3d at p. 706; see *Horn*, *supra*, 72 Cal.App.4th at p. 807; and see *Pamintuan v. Nanticoke Mem'l Hosp.* (3d Cir. 1999) 192 F.3d 378, 387 [distinguishing *Weldon* and concluding plaintiff's deposition testimony that she did not have clinical deficiencies was not sufficient to create triable issue of fact regarding discrimination, and

she performed particular tasks well contradict the " 'core facts' " that Giles believed plaintiff behaved inappropriately during the service desk incident, made mistakes and lacked attention to detail, and was unwilling to help others.

Plaintiff contends, however, that the statements in her review and PIP—that she showed the "inability" to follow guidelines and adjust to changing priorities and that she did not "retain" directions—reflected stereotypes based on age. (See *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 896 [noting that old people may be " ' "categorized as senile, rigid in thought and manner, old-fashioned in morality and skills" ' "].) She relies on *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 567, which states, "Age discrimination laws target the generality that an individual cannot do the work just because he or she has reached a certain age." In *O'Mary*, the court considered whether the rule against hearsay prohibited admission of the "undoubtedly relevant evidence" that a director of the defendant company had made a statement " 'about getting rid of managers who were over 40 and replacing them with younger, more aggressive managers.' " (*Id.* at pp. 566–567.) The statements of which plaintiff complains do not support a conclusion that Giles assumed, because of plaintiff's age, that she *could not* perform her job properly; rather, they indicate that Giles concluded that in fact she *was not* performing it adequately. Any other conclusion could only be based on speculation and conjecture. (See *Lattimore*, *supra*, 239 Cal.App.4th at p. 967.) On the record before us, no reasonable trier of fact could find defendants' proffered reasons " ' " 'unworthy of credence.' " ' " (*Horn*, *supra*, 72 Cal.App.4th at p. 807.)

We agree with the trial court that there is no triable issue of fact as to plaintiff's claim for age discrimination.

stating, "were we to find that testimony such as [plaintiff's] was sufficient to survive summary judgment on the issue of pretext, we would undermine the entire *McDonnell Douglas* framework by drastically limiting the possibility that summary judgment could be granted because virtually any contrary testimony by a plaintiff would preclude a grant of summary judgment to the defendants"].)

19

## B. National Origin Discrimination

Plaintiff also contends her supposed "English Communication Problems" were a pretext for discrimination based on her national origin. We reject this contention. Given the facts that two of the four other people on the European Cosmetics team were of Asian origin and plaintiff was replaced by an Asian-American woman, plaintiff cannot meet her prima facie burden to show that she was treated less favorably than others not in the protected class. (See *Caldwell*, *supra*, 41 Cal.App.4th at p. 200.)

Even if there were a prima facie case of such discrimination, DFS has met its burden, as we have discussed above, to produce substantial evidence that its action was taken for legitimate, nondiscriminatory reasons. (*Guz*, *supra*, 24 Cal.4th at pp. 355–356; *Swanson*, *supra*, 232 Cal.App.4th at p. 966.) The burden thus shifted to plaintiff to offer substantial evidence that the stated reason was untrue or pretextual or that the employer acted with discriminatory animus. (*Swanson*, *supra*, 232 Cal.App.4th at p. 966.) The only evidence she offers is the heading of the "English Communication Problems!" email forwarded by Dare to Giles. Whatever its heading, the email reflects *Dare's* frustration with plaintiff's difficulty understanding what was required. The email is insufficient to show that *Giles* was motivated by discriminatory animus in dismissing plaintiff. Indeed, in arguing the motion for summary judgment below, plaintiff's trial counsel conceded that she did not think the email was adequate to support the cause of action for discrimination based on race and national origin. We agree.[9]

## C. Retaliatory Termination

FEHA forbids an employer to "discharge, expel, or otherwise discriminate against any person because the person has . . . filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).)

---

[9] Plaintiff also suggests in her statement of facts—but not in her argument—that Dare's reference to Cheng as "someone" who surfs the internet and goes home early was a veiled reference to Cheng's race. There is no basis to conclude the comment was racially charged.

We apply the *McDonnell Douglas* test in evaluating a motion for summary judgment on a retaliation claim. (*Sada v. Robert F. Kennedy Medical Center.* (1997) 56 Cal.App.4th 138, 155 (*Sada*).) "In a retaliation case, the *McDonnell Douglas* test 'require[s] that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant articulate a legitimate nonretaliatory explanation for its acts, and (3) the plaintiff show that the defendant's proffered explanation is merely a pretext for the illegal termination. . . . [¶] To establish a prima facie case, the plaintiff must show that [she] engaged in a protected activity, [the] employer subjected [her] to adverse employment action, and there is a causal link between the protected activity and the employer's action. . . . [¶] . . . [¶] Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.' [Citation.]" (*Id*. at pp. 155–156, fn. omitted.)[10]

For her contention that she met her initial burden to show a causal link between her protected activity of filing an EEOC complaint and her dismissal, plaintiff points to the timing of the dismissal, just a week after defendants learned that she had filed a complaint with the EEOC. "For purposes of making a prima facie showing, the causal link element may be established by an inference derived from circumstantial evidence. A plaintiff can satisfy his or her initial burden under the test by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision. [Citation.]" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388 (*McRae*).) We shall assume for purposes of argument that plaintiff met her initial burden. However, as we have already discussed, DFS articulated a legitimate explanation for its acts, and the burden thus shifted to plaintiff to show DFS's explanation was a pretext for retaliation. (*Sada*, *supra*, 56 Cal.App.4th at p. 155; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

---

[10] DFS does not dispute that plaintiff engaged in protected activity by filing a complaint with the EEOC.

21

In an attempt to meet this burden, plaintiff again relies on the temporal proximity between the protected activity and the adverse employment action. As explained in *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112–1113, "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual. [The] contrary argument, if accepted, would eviscerate the *McDonnell Douglas* framework for resolving claims at the demurrer or summary judgment stage, because the same minimal showing required of the plaintiff to raise a prima facie case would also suffice to preclude the employer from obtaining summary judgment notwithstanding otherwise unrebutted proof of articulated legitimate reasons for the employment termination. Instead, an employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual. [Citation.]" (Accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 868; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 990.)[11]

That does not mean, however, that temporal proximity is never relevant in deciding whether an employer's proffered explanation is pretextual. The court in *Diego v. Pilgrim United Church of Christ* (2014) 231 Cal.App.4th 913, 932 (*Diego*) stated, "Although 'temporal proximity alone is not sufficient to raise a triable issue as to pretext,' 'temporal proximity, *together* with the *other* evidence, may be sufficient to establish pretext.' [Citation.]" The *Diego* court relied on *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353–354, which explained: "In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for

---

[11] See also *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1020–1021 [close temporal proximity between protected action and adverse employment decision established causal link for purposes of prima facie case but plaintiff failed to show pretext as well].)

22

several years, has a good or excellent performance record, and then, after engaging in some type of protected activity . . . is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated." The court in *Arteaga* went on to note that an employee who feared his or her job was on the line could not tie the employer's hands by engaging in protected conduct: " 'Employers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace. . . . Precedent does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in protected work activity . . . .' [Citations.]" (*Id.* at p. 354.)

Plaintiff has not met her burden to offer substantial evidence that DFS's action was pretextual. She relies on two facts: Giles and Millard berated her about her refusal to call to the support desk only hours after DFS learned of her complaint on March 29, and she was dismissed approximately a week after DFS received notice of the complaint. We may dispose of her first contention easily. There is evidence that Rubia did not tell anyone of the EEOC complaint, and Giles was unaware of it, until March 30, the day after the support desk incident, and plaintiff offers no evidence otherwise.

The second fact—that plaintiff was dismissed shortly after filing her EEOC complaint—is insufficient to show DFS's explanation was pretextual. We recognize that the court in *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479–480, considered the timing of the company's termination decision, along with the identity of the person making the decision and the employee's job performance before termination, to support an inference of pretext. The employee there had complained that a company senior vice-president made offensive sexual remarks to another employee. (*Ibid.*) But no one at the company had looked at the employee's sales or other records before terminating his employment, and the employee had increased his sales by nearly 60 percent immediately before his termination. (*Id.* at p. 480.)

Here, in contrast, although plaintiff had received good or satisfactory reviews in previous years in other sections of the company, Giles's concerns about plaintiff's performance in her new department had arisen from the outset. Giles discussed her

23

concerns with plaintiff in October 2010, she gave plaintiff a negative performance evaluation at the beginning of 2011, and she gave plaintiff a PIP on March 8, 2011. At that time, plaintiff was warned that she was subject to termination if her job performance did not improve and was informed Giles would be reviewing her performance in 30 days, on April 7, 2011. Giles spoke with plaintiff again on March 25, telling her she needed to improve her work. As April 7 approached, Giles concluded plaintiff's performance had not improved sufficiently, in part due to the service desk incident and in part because plaintiff continued to make mistakes, did not solve problems on her own, and did not help others.

The fact that the company had been raising concerns about plaintiff's job performance for months distinguishes this case from those upon which she relies. In *Diego*, a preschool employee was fired a week after the licensing agency carried out an unannounced inspection for which the preschool believed the employee was responsible. (*Diego*, *supra*, 231 Cal.App.4th at pp. 918–919.) The appellate court found a factual dispute regarding whether the dismissal was a pretext, based on the facts that the employee had worked at the preschool for many years, had been promoted, and had had a recent favorable review; based on the timing of the firing; and based on a telephone conversation three days before the firing in which the preschool director: asked the plaintiff why she was " ' "doing this" ' and whether [the plaintiff] wanted [the director] ' "gone" '; explained that people had been telling her ' "things" ' "; told her the State was going to take over the preschool; and stated " ' "they" ' " wanted to know why the licensing agency had received so many notices of violations. (*Id.* at pp. 918, 932.) There was no substantial evidence the preschool was dissatisfied with the employee's performance before it became concerned she had reported violations to the licensing agency. (*Id.* at p. 931.)

The other cases cited by plaintiff are similarly distinguishable. In *Reeves v. Safeway Stores, Inc., supra*, 121 Cal.App.4th at pp. 100–102, 105, the company began investigating the employee *after* he engaged in a protected activity, complaining about sexual harassment. In *Sada*, the job performance of the plaintiff had been considered

praiseworthy until the director of her unit ordered a "reevaluation" after the plaintiff complained to the California Department of Fair Employment and Housing of discrimination based on her national origin and ancestry. (*Sada*, *supra*, 56 Cal.App.4th at pp. 145–146, 157.) In *Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1146, 1152–1153, the plaintiff presented evidence not only that a director had expressed the desire for revenge on those who had cooperated in an investigation of her alleged sexual harassment, but also that before the investigation took place the plaintiff had been considered a top performer and nothing negative had been said about her. Finally, in *California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1023, there were no complaints about plaintiff's work until after he attended a religious convention.[12]

In the same vein, none of the federal cases upon which plaintiff relies persuades us that she met her burden to show pretext. (See *Yartzoff v. Thomas* (9th Cir. 1987) 809 F.2d 1371, 1375–1377 [transfers of job duties and sub-average performance ratings all occurred during pendency of administrative complaints and investigations, and supervisors harassed plaintiff during period in question]; *Bell v. Clackamas County* (9th Cir. 2003) 341 F.3d 858, 866 [temporal proximity of plaintiff's complaints and adverse employment actions, together with evidence of superiors' contemporaneous displeasure with complaints, provided circumstantial evidence of retaliation]; *Love v. RE/MAX of*

---

[12] *Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1267–1268, cited by plaintiff, considers a cause of action for interference with prospective economic advantage and is not relevant to our analysis here. In any case, *Overhill's* facts are distinguishable. The plaintiff company in *Overhill* sued former employees and a community activist for making defamatory statements about its labor practices by conducting demonstrations, distributing leaflets and flyers, and protesting in front of one of its customers, accusing the plaintiff of racism and other improper practices. (*Id.* at pp. 1251–1252, 1255–1256.) Within two weeks, one of the employer's customers subjected it to an "ethics audit" focusing on "immigration issues." (*Id.* at p. 1266.) In considering the employer's claim for interference with prospective economic advantage, the court concluded the evidence was sufficient to show the defendant's statements caused the customer to take its adverse action; the court considered not only the temporal proximity, but *also* the fact that the customer had never done anything similar in the past. (*Id.* at p. 1267.)

*America, Inc.* (10th Cir. 1984) 738 F.2d 383, 386 [employee fired two hours after company received memo requesting a raise and attaching a copy of the Equal Pay Act; reasons offered by employer for firing were "unconvincing 'afterthoughts,' . . . and not worthy of belief"]; *Passantino v. Johnson & Johnson Consumer Products* (9th Cir. 2000) 212 F.3d 493, 500–502, 506–507 [affirming judgment for plaintiff on retaliation claim where employer's treatment of plaintiff changed after she made complaints]; *Foraker v. Apollo Group, Inc.* (D. Ariz. 2006) 427 F.Supp.2d 936, 943 [summary judgment on Family Medical Leave Act (29 U.S.C. § 2601 et seq.) cause of action improper where loss of title, responsibilities, and raise occurred while plaintiff was on medical leave]; *Strother v. Southern Cal. Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 869–871 [summary judgment for retaliation claim improper where plaintiff had been warned it was not in her interest to file discrimination charge, she was demoted a day after filing EEOC complaint, and there was substantial evidence contradicting defendant's proffered explanation that plaintiff had poor interpersonal skills]; *Miller v. Fairchild Industries, Inc.* (9th Cir. 1986) 797 F.2d 727, 731–732 [plaintiffs were laid off less than two months after negotiating EEOC settlement agreements and were the only people in their departments laid off].)

In each of these cases, the negative evaluations or treatment of the plaintiff began after the protected activity began, the employer's explanation was inadequate, or there was additional evidence of retaliation. Here, on the other hand, the negative evaluations began well before plaintiff filed her complaint, the evidence supports defendants' explanation, and there are no additional factors to support a finding of retaliation.[13] The

---

[13] In *Slattery v. Swiss Reinsurance Am. Corp.* (2d Cir. 2001) 248 F.3d 87, 95, the court concluded that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." The adverse job actions there had begun five months before the plaintiff filed EEOC charges. (*Ibid.*) Here, Giles had first expressed her dissatisfaction with plaintiff's work five months before plaintiff filed her complaint, had given her a negative review approximately two months previously, and had placed her on a PIP earlier the same month with a warning that she could lose her job if she did not improve her performance. In light of this history, and in

26

trial court properly concluded there is no triable issue of fact on the cause of action for retaliation.

## D. Hostile Work Environment

Plaintiff also contends the evidence supports a finding that she was subjected to a hostile work environment as a result of the negative comments made about her. FEHA makes it unlawful for " an employer . . . or any other person, because of . . . national origin . . . [or] age . . . to harass an employee." (Gov. Code § 12940, subd. (j)(1).) Our high court has explained that for purposes of FEHA, "harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707.) To prevail on a claim for harassment based on a hostile work environment, plaintiff must "demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [protected status]. [Citation.] The working environment must be evaluated in light of the totality of the circumstances: '[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' [Citation.]" (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462 (*Miller*).) Whether the harassment was sufficiently severe to change the conditions of employment is judged objectively. (*Lyle*, *supra*, 38 Cal.4th at p. 283.) The plaintiff must show that

---

the absence of any other evidence of retaliation, there is no triable issue as to retaliation. (But see *Allen v. J.P. Morgan Chase & Co.* (S.D.N.Y. 2009) 2009 U.S. Dist. LEXIS 29116, *33–35 [issue of fact as to retaliation where defendants took first adverse action against plaintiff only six days before plaintiff's first complaints, although they considered taking action one or two months previously]; *Gordon v. Health & Hosp.* (E.D.N.Y. 2008) 2008 U.S. Dist. LEXIS 27606, *38–39 [distinguishing *Slattery* on ground four years had passed between plaintiff's disciplinary record and events that led to action].)

the harassing conduct was motivated by discriminatory bias toward the plaintiff's age or other protected characteristic. (*Roby, supra*, 47 Cal.4th at p. 709.)

We agree with the trial court that there is no triable issue of fact as to the harassment claim. None of the comments made by plaintiff's co-workers referred to her national origin, and no reasonable trier of fact could conclude they were motivated by bias toward her Chinese national origin. Nor, as we have discussed, would the evidence support a conclusion that the negative comments plaintiff received were motivated by or directed toward her age, rather than to her perceived job performance. Nor, for that matter, could the comments of which plaintiff complains reasonably be seen as severe or pervasive enough to alter her conditions of employment and create a hostile or abusive work environment. (See *Miller*, *supra*, 36 Cal.4th at p. 462.)

### III.    DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Streeter, J.